IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

_____

| | |
|---|---|
| STEVEN F. HOTZE, M.D., DANIEL ROGERS, RUSSELL RAMSLAND, MICHAEL WALLIS, and the ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE TREASURY, <br><br> JANET YELLEN, in her official capacity as the Secretary of the United States Department of the Treasury, and <br><br><br> ANDREA GACKI, in her official capacity as Director of the Financial Crimes Enforcement Network, <br><br> Defendants. | Civil Action No. 2:24-CV-00210-Z |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

LEIGHA SIMONTON
UNITED STATES ATTORNEY

Saurabh Sharad
Assistant United States Attorney
New York Bar No. 5363825
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8600
saurabh.sharad@usdoj.gov

Attorneys for Defendants

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................ 2

    I.       Statutory Background............................................................................... 2

    II.     FinCEN's Rulemaking ............................................................................ 5

    III.    Procedural History.................................................................................. 5

LEGAL STANDARD ..................................................................................................... 6

ARGUMENT .................................................................................................................. 6

    I.       Plaintiffs fail to show irreparable harm................................................. 6

    II.     Plaintiffs fail to show likelihood of success on the merits.................... 7

        A.  The CTA is authorized by Congress's enumerated powers. ............................ 7

        B.  The CTA does not violate the First Amendment............................................ 14

        C.  The CTA does not violate the Fourth Amendment. ....................................... 18

        D.  The CTA does not violate the Fifth Amendment. .......................................... 20

    III.    The remaining factors weigh against injunctive relief. ....................... 22

    IV.    Plaintiffs' proposed injunction is improper......................................... 23

CONCLUSION.............................................................................................................. 24

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ..................................................................................................... 14, 16

*Anyadike v. Vernon Coll.*,
No. 7:15-cv-157, 2015 WL 12964684 (N.D. Tex. Nov. 20, 2015) ............................................ 6

*Big Tyme Invs., LLC v. Edwards*,
985 F.3d 456 (5th Cir. 2021) ......................................................................................... 6

*Brown v. Texas*,
443 U.S. 47 (1979) .................................................................................................... 20

*Cal. Bankers Ass'n v. Shultz*,
416 U.S. 21 (1974) ......................................................................................... 2, 13, 18, 19

*Carpenter v. United States*,
585 U.S. 296 (2018) .................................................................................................. 20

*Castro v. City of Grand Prairie*,
No. 3:21-cv-885, 2021 WL 1530303 (N.D. Tex. Apr. 19, 2021) ................................................ 7

*Citizens United v. FEC*,
558 U.S. 310 (2010) .............................................................................................. 16, 17, 18

*Cmty. Ass'ns Inst. v. Yellen*,
No. 1:24-cv-1597, 2024 WL 4571412 (E.D. Va. Oct. 24, 2024) ............................... 10, 11, 12, 22

*Covey v. Ark. River Co.*,
865 F.2d 660 (5th Cir. 1989) ........................................................................................... 7

*Dep't of Homeland Sec. v. New York*,
140 S. Ct. 599 (2020) ................................................................................................. 23

*Donovan v. Lone Steer, Inc.*,
464 U.S. 408 (1984) .................................................................................................. 19

*Elec. Bond & Share Co. v. SEC*,
303 U.S. 419 (1938) .................................................................................................. 12

*Firestone v. Yellen*,
No. 3:24-cv-1034, 2024 WL 4250192 (D. Or. Sept. 20, 2024) ........................................... *passim*

*Gill v. Whitford*,
585 U.S. 48 (2018) .................................................................................................... 23

*Gonzales v. Raich*,
  545 U.S. 1 (2005) ................................................................................................ 8, 10

*Google, Inc. v. Hood*,
  822 F.3d 212 (5th Cir. 2016) ................................................................................... 7

*Groome Res. Ltd., L.L.C. v. Par. of Jefferson*,
  234 F.3d 192 (5th Cir. 2000) ............................................................................... 8, 9

*Hill v. Colorado*,
  530 U.S. 703 (2000) ............................................................................................... 22

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
  452 U.S. 264 (1981) ......................................................................................... 10, 11

*Kennedy v. Mendoza-Martinez*,
  372 U.S. 144 (1963) ............................................................................................... 13

*Klayman v. Obama*,
  805 F.3d 1148 (D.C. Cir. 2015) ............................................................................. 20

*Labrador v. Poe*,
  144 S. Ct. 921 (2024) ............................................................................................. 23

*Laird v. Tatum*,
  408 U.S. 1 (1972) ................................................................................................... 16

*Leaf Trading Cards, LLC v. Upper Deck Co.*,
  No. 3:17-cv-3200, 2019 WL 7882552 (N.D. Tex. Sept. 18, 2019) ............................ 6

*Los Angeles v. Patel*,
  576 U.S. 409 (2015) ............................................................................................... 20

*MA LEG Partners 1 v. Dallas*,
  442 F. Supp. 3d 958 (N.D. Tex. 2020) ................................................................... 15

*Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*,
  447 F. Supp. 3d 522 (N.D. Tex. 2020) ............................................................... 6, 22

*McCulloch v. Maryland*,
  17 U.S. (1819) .......................................................................................................... 9

*McDonald v. Longley*,
  4 F.4th 229 (5th Cir. 2021) .................................................................................... 15

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024) ...................................................................................... 14, 18

*NAACP v. Alabama ex rel. Patterson*,
 357 U.S. 449 (1958)............................................................................................ 16, 17

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
 567 U.S. 519 (2012).............................................................................................. 8, 12

*Nat'l Small Bus. United v. Yellen*,
 721 F. Supp. 3d 1260 (N.D. Ala. 2024)............................................................... 11, 12

*Nken v. Holder*,
 556 U.S. 418 (2009).................................................................................................... 22

*NLRB v. Jones & Laughlin Steel Corp.*,
 301 U.S. 1 (1937).......................................................................................................... 8

*Parker v. Levy*,
 417 U.S. 733 (1974).................................................................................................... 21

*RJ Reynolds Tobacco Co. v. FDA*,
 96 F.4th 863 (5th Cir. 2024)....................................................................................... 15

*Second Amend. Found. v. ATF*,
 No. 3:21-cv-0116, 2023 WL 4304760 (N.D. Tex. June 30, 2023)............................. 23

*Sheffield v. Bush*,
 604 F. Supp. 3d 586 (S.D. Tex. 2022) ......................................................................... 7

*Skinner v. Ry. Lab. Execs.' Ass'n*,
 489 U.S. 602 (1989).................................................................................................... 20

*Trump v. Hawaii*,
 585 U.S. 667 (2018).................................................................................................... 23

*United States v. Bolatete*,
 977 F.3d 1022 (11th Cir. 2020) ............................................................................ 13, 14

*United States v. Brigham*,
 382 F.3d 500 (5th Cir. 2004) ..................................................................................... 20

*United States v. Comstock*,
 560 U.S. 126 (2010)...................................................................................................... 9

*United States v. Flores*,
 63 F.3d 1342 (5th Cir. 1995) ..................................................................................... 21

*United States v. Fortenberry*,
 89 F.4th 702 (9th Cir. 2023) ...................................................................................... 18

iv

*United States v. Goodwin*,
141 F.3d 394 (2d Cir. 1997)..................................................................................... 9

*United States v. Lopez*,
514 U.S. 549 (1995)................................................................................................. 8

*United States v. Morton Salt Co*,
338 U.S. 632 (1950)................................................................................................. 19

*United States v. McClaren*,
13 F.4th 386 (5th Cir. 2021) ................................................................................... 9

*United States v. Salerno*,
481 U.S. 739 (1987)................................................................................................. 8

*United States v. Williams*,
553 U.S. 285 (2008)........................................................................................... 21, 22

*Valentine v. Collier*,
956 F.3d 797 (5th Cir. 2020) ................................................................................. 22

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982)................................................................................................. 20

*W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*,
751 F.2d 721 (5th Cir. 1985) ................................................................................. 23

*Wacko's Too, Inc. v. City of Jacksonville*,
522 F. Supp. 3d 1132 (M.D. Fla. 2021)................................................................. 21

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008)........................................................................................... 15, 18

*White v. Carlucci*,
862 F.2d 1209 (5th Cir. 1989) ............................................................................... 6

*Wine & Spirits Retailers, Inc. v. Rhode Island*,
418 F.3d 36 (1st Cir. 2005)..................................................................................... 15

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)............................................................................................. 6, 7, 22

*Wireless Agents LLC v. T-Mobile, USA, Inc.*,
No. 3:05-cv-94, 2006 WL 1540587 (N.D. Tex. Jun. 6, 2006)................................ 7

*Ziglar v. Abbasi*,
582 U.S. 120 (2017)................................................................................................. 13

**U.S. Constitution**

Art. I, § 8, cl. 3 ................................................................................................................ 8

Art. I, § 8, cl. 18 .............................................................................................................. 9

**Statutes**

5 U.S.C. § 553(a)(1) ...................................................................................................... 22

5 U.S.C. § 701(a) ........................................................................................................... 22

5 U.S.C. § 702(2) ............................................................................................................. 7

8 U.S.C. § 1324a ........................................................................................................... 19

18 U.S.C. § 1001 .............................................................................................................. 2

18 U.S.C. § 1341 .............................................................................................................. 2

18 U.S.C. § 1343 .............................................................................................................. 2

18 U.S.C. § 1956 .............................................................................................................. 2

18 U.S.C. § 1957 .............................................................................................................. 2

18 U.S.C. § 2339C ............................................................................................................ 2

18 U.S.C. § 922(g)(1) .................................................................................................... 15

26 U.S.C. § 6012 ...................................................................................................... 14, 19

26 U.S.C. § 7201 ......................................................................................................... 2, 15

31 U.S.C. § 5311 ..................................................................................................... 2, 18, 19

31 U.S.C. § 5313 ............................................................................................................ 18

31 U.S.C. § 5336 ..................................................................................................... *passim*

52 U.S.C. § 30104 ..................................................................................................... 14, 19

Anti-Money Laundering Act of 2020,
        Pub. L. No. 116-283, div. F., 134 Stat. 4547 (2021) ................................................ *passim*

**Rule**

Fed. R. Civ. P. 65(d) ...................................................................................................... 24

**Regulations**

31 C.F.R. § 1010.230(f) ........................................................................................... 11

31 C.F.R. § 1010.312 ............................................................................................... 18

31 C.F.R. § 1010.380(a)(1)(iii) ................................................................................. 5

31 C.F.R. § 1010.380(b)(4) ..................................................................................... 24

31 C.F.R. § 1010.380(d)(1) ..................................................................................... 21

31 C.F.R. § 1010.380(e) ............................................................................................ 4

31 C.F.R. § 1010.605(e) .......................................................................................... 11

*Beneficial Ownership Information Reporting Requirements*,
87 Fed. Reg. 59,498 (Sept. 30, 2022) ............................................................... *passim*

**Other Authorities**

11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* (3d ed. 2013) ............. 6

H.R. Rep. No. 116-227 (2019) ........................................................................ 2, 12, 13

**INTRODUCTION**

Federal statutes have long prohibited money laundering, terrorist financing, tax evasion, and other harmful economic activities.  As illicit actors find new ways to circumvent those laws, Congress has responded to ensure that federal law enforcement can obtain the information needed to effectively investigate and prosecute crimes and return the proceeds of those crimes to victims. In recent years, money launderers, terrorist financers, and other malign actors have exploited anonymous shell corporations to conceal their illegal activity.  Criminals, both domestic and international, can easily create these entities under state laws and may generally do so without disclosing their involvement.  As a result, the United States has become a popular jurisdiction for such criminals to create legal entities that facilitate and further fraud, human smuggling, corruption, drug trafficking, and terrorist financing.

To address these harms, Congress passed the Anti-Money Laundering Act of 2020, which includes the Corporate Transparency Act (CTA).  This legislation requires nonexempt companies to report information about their "beneficial owners"—the natural person or group of natural people who ultimately own or control a legal entity—to the Financial Crimes Enforcement Network (FinCEN), a bureau of the U.S. Department of the Treasury.  Congress found that this information will prove highly useful to law enforcement and the intelligence community's efforts to counter the threat posed by terrorists, proliferators, and others undermining U.S. interests.

Plaintiffs urge the Court to preliminarily enjoin the CTA on a nationwide basis.  Their challenge lacks merit.  Plaintiffs cannot establish irreparable harm, particularly in light of their years-long delay in seeking relief.  Plaintiffs also cannot show a likelihood of success because the CTA falls squarely within Congress's enumerated powers to regulate commerce, protect national security, and lay and collect taxes.  And as a number of other district courts have recognized in rejecting similar requests, the limited reporting requirements at issue here do not impinge on the First, Fourth, or Fifth Amendments.  None of the remaining factors weigh in favor of injunctive relief.  The Court should deny the motion.

1

**BACKGROUND**

## I.    Statutory Background

Federal law has long prohibited money laundering, *see* 18 U.S.C. §§ 1956, 1957, terrorist financing, *see id.* § 2339C, tax evasion, *see* 26 U.S.C. § 7201, and other harmful economic activities, *see, e.g.*, 18 U.S.C. §§ 1001, 1341, 1343 (prohibiting false statements and various forms of fraud). Because of the complexity and sophistication of financial crime, Congress has continued to enact legislation to aid enforcement. *See, e.g.*, *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 26 (1974) (discussing certain provisions of the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq*.).

Despite these efforts, Congress identified a significant gap in the government's ability to detect and prosecute financial crime. Under state law, "corporations, limited liability companies, [and] other similar entities" are generally not required to report "information about the[ir] beneficial owners." National Defense Authorization Act (NDAA), Pub. L. No. 116-283, § 6402(2), 134 Stat. 3388, 4604 (2021). "A person forming a corporation or limited liability company within the United States" thus "typically provides less information at the time of incorporation than is needed to obtain a bank account or driver's license." H.R. Rep. No. 116-227, at 2 (2019). That enables "malign actors" to "conceal their ownership of corporations" and then use those anonymous corporations to engage in "money laundering," "the financing of terrorism," and "serious tax fraud." NDAA § 6402(3).

Criminals frequently exploited this enforcement gap. Federal prosecutors report that "large-scale schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies." *Beneficial Ownership Information Reporting Requirements*, 87 Fed. Reg. 59,498, 59,503 (Sept. 22, 2022). Likewise, drug traffickers "commonly use shell and front companies . . . to launder their drug proceeds." *Id.*

In addition to facilitating domestic crime, the absence of company ownership information threatens U.S. national-security and foreign-policy interests. For instance, "Russian elites, state-owned enterprises, and organized crime, as well as the Government of the Russian Federation have

2

attempted to use U.S. and non-U.S. shell companies to evade sanctions," 87 Fed. Reg. at 59,498, as has the Government of Iran, *id.* at 59,502.

For similar reasons, criminals can use the government's lack of information about the ownership of corporations to obscure their assets and thus perpetrate "serious tax fraud." NDAA § 6402(3). Indeed, a "Treasury study based on a statistically significant sample of adjudicated IRS cases from 2016–2019 found legal entities were used in a substantial proportion of the reviewed cases to perpetrate tax evasion and fraud." 87 Fed. Reg. at 59,503. Because the United States did not collect beneficial ownership information, it fell out of "compliance with international anti-money laundering and countering the financing of terrorism standards." NDAA § 6402(5)(E).

To address this enforcement gap, Congress enacted ownership reporting requirements. The Anti-Money Laundering Act of 2020 (AMLA) adopts various provisions designed to "modernize" federal "anti-money laundering" laws and those "countering the financing of terrorism." NDAA § 6002(2). Among those provisions is the CTA, which "establish[es] uniform beneficial ownership information reporting requirements." *Id.* § 6402(5). In passing the AMLA and CTA, Congress explained that "the collection of beneficial ownership information" is "needed" to, among other things, protect "vital Unite[d] States national security interests" and "interstate and foreign commerce," and to "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity." *Id.* § 6402(5)(B)-(D). The Executive Branch agrees. *See* 87 Fed. Reg. at 59,498.

The CTA accordingly requires each "reporting company" to disclose to FinCEN information about its beneficial owners and applicants. 31 U.S.C. § 5336(b). A "reporting company" is "a corporation, limited liability company, or other similar entity that is . . . (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." *Id.* § 5336(a)(11)(A) .

3

The CTA excludes various entities already subject to reporting or recordkeeping requirements, *see* 31 U.S.C. § 5336(a)(11)(B), as well as many domestically owned entities no longer engaged in business. *Id.* § 5336(a)(11)(B)(xxiii). It also excludes many trusts, political organizations, and non-profits. *See id.* § 5336(a)(11)(B)(xix). And it allows the Secretary of the Treasury (with the concurrence of the Attorney General and the Secretary of Homeland Security) to exempt any other "entity or class of entities" for which "requiring beneficial ownership information" would not "serve the public interest" and "would not be highly useful" in "efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, . . . or other crimes." *Id.* § 5336(a)(11)(B)(xxiv).

Congress defined "beneficial owner" as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise . . . (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A). *But see id.* § 5336(a)(3)(B) (exemptions). An "applicant" is the individual who files or directs the filing of documents to create the corporate entity or, if foreign, registers it to do business in the United States. *Id.* § 5336(a)(2); 31 C.F.R. § 1010.380(e). To comply with its statutory obligations, a reporting company must report the beneficial owner's and applicant's legal name, date of birth, residential or business address, and "unique identifying number from an acceptable identification document." 31 U.S.C. § 5336(b)(2)(A); *see id.* § 5336(a)(1) (types of acceptable identification documents).

Congress prescribed that FinCEN must appropriately maintain the security and confidentiality of reported information. 31 U.S.C. § 5336(c)(3), (8). Such information "shall be confidential and may not be disclosed" except as specifically authorized by the CTA. *Id.* § 5336(c)(2)(A). For instance, FinCEN may disclose beneficial ownership information after receiving a request "through appropriate protocols" "from a Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity," or to "a State, local, or Tribal law enforcement agency" when a competent court has authorized the agency "to seek the information in a criminal or civil investigation." *Id.* § 5336(c)(2)(B)(i). In more

limited circumstances, FinCEN may also disclose beneficial ownership information to "a Federal agency on behalf of a law enforcement agency, prosecutor, or judge of another country," or to "a Federal functional regulator or other appropriate regulatory agency." *Id.* § 5336(c)(2)(B)(ii), (B)(iv), (C). FinCEN may nonetheless reject requests, including for "good cause," *id.* § 5336(c)(6), and "may suspend or debar a requesting agency" from accessing the information, including for repeated or serious violations of the CTA's requirements, *id.* § 5336(c)(7).

## II.    FinCEN's Rulemaking

The CTA directs FinCEN to implement certain aspects of the statute by regulation. *See id.* § 5336(b)(5). FinCEN issued its final rule on beneficial ownership information reporting in September 2022. 87 Fed. Reg. at 59,509. As relevant here, the rule, as amended, establishes the deadlines by which covered entities must comply with the statute. For businesses created or registered before 2024, compliance is required by January 1, 2025. *See* 31 C.F.R. § 1010.380(a)(1)(iii).

## III.    Procedural History

Plaintiffs filed this action on September 26, 2024. Compl., ECF No. 1. Plaintiffs consist of four individuals and one Indiana nonprofit entity (Association of American Physicians & Surgeons (AAPS)). *Id.* ¶¶ 14-18. Plaintiffs claim, first, that the CTA exceeds Congress's enumerated powers and thus violates the Tenth Amendment. *Id.* ¶¶ 60-81. Second, they contend that the CTA's reporting requirements chill their First Amendment freedom to associate. *Id.* ¶¶ 85-94. Third, they assert that the CTA violates the Fourth Amendment's prohibition on warrantless searches. *Id.* ¶¶ 97-104. Fourth, in Plaintiffs' view, the CTA is unconstitutionally vague under the Fifth Amendment. *Id.* ¶¶ 106-15. And fifth, Plaintiffs challenge FinCEN's final rule under the Administrative Procedure Act (APA), 5 U.S.C. § 702(2). *Id.* ¶¶ 118-22.

A month after filing their action, Plaintiffs moved for a preliminary injunction on October 28, 2024. ECF No. 16 (Mot.). Plaintiffs seek a nationwide injunction prohibiting enforcement of the CTA and its implementing regulations. *Id.* at 25. In the alternative, they seek the same relief

as to Plaintiffs, all "members of Plaintiff AAPS," and any "entities with which Plaintiffs and AAPS's members are or seek to be associated." *Id.*

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To prevail, Plaintiffs must "clearly" establish (1) "a substantial threat of irreparable injury," (2) "a substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest." *Big Tyme Invs., LLC v. Edwards*, 985 F.3d 456, 464 (5th Cir. 2021) (cleaned up).

## ARGUMENT

### I.    Plaintiffs fail to show irreparable harm.

As detailed further below, Plaintiffs do not show a likelihood of success on any of their claims. Even with the merits aside, Plaintiffs' request for preliminary relief flounders at the outset for they fail to show any irreparable harm. Their motion may be denied on this ground alone.

"The 'irreparable harm' factor is perhaps the most important of the four elements that the Court must consider when adjudging a motion for a preliminary injunction." *Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*, 447 F. Supp. 3d 522, 534 (N.D. Tex. 2020) (Kacsmaryk, J.) (citing 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2013)). The harm alleged must be specific, not speculative, *see id.*, and shown "by independent proof, or no injunction may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

For starters, Plaintiffs' years-long delay in filing this action undermines any claim of imminent harm that could justify emergency relief. Courts in this district scrutinize "delay in seeking relief . . . when analyzing the threat of imminent and irreparable harm." *Anyadike v. Vernon Coll.*, No. 7:15-cv-157, 2015 WL 12964684, at *3 (N.D. Tex. Nov. 20, 2015). "[A]nywhere from a three-month delay to a six-month delay [is] enough to militate against issuing injunctive relief." *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-cv-3200, 2019 WL 7882552, at *2 (N.D. Tex. Sept. 18, 2019) (collecting cases). Here, the bipartisan CTA was

enacted in 2021, more than three years before Plaintiffs filed the instant suit. FinCEN published its final rule over two years ago. 87 Fed. Reg. 59,498. And FinCEN has been accepting beneficial ownership reports since January 1, 2024. *See* FinCEN FAQ B.3, https://perma.cc/LE24-SVRB.

While delay can be excused by a "good explanation," *Wireless Agents LLC v. T-Mobile, USA, Inc.*, No. 3:05-cv-94, 2006 WL 1540587 (N.D. Tex. Jun. 6, 2006) (citation omitted), Plaintiffs offer nothing to excuse their delay here. They also say nothing concerning the additional month they waited after commencing suit to file the motion at hand. Plaintiffs' dilatory course of action weighs heavily against any injunctive relief. After all, equitable remedies are "not intended for those who sleep on their rights." *Covey v. Ark. River Co.*, 865 F.2d 660, 662 (5th Cir. 1989).

Plaintiffs do not establish irreparable harm in any event. Plaintiffs first point to their "fear" that information disclosed to FinCEN could "be leaked . . . on the internet" or hacked by outside actors. Mot. at 22. This is insufficient. At most, Plaintiffs' fear amounts only to "a *possibility* of irreparable harm," not the "clear showing" demanded by law. *See Winter*, 555 U.S. at 22 (emphasis added). Plaintiffs then turn (at 21-23) to the First Amendment, arguing that the CTA chills their "everyday associative activity" and deters their participation in "small local entities." Remarkably, Plaintiffs fail to identify any entity with which they will refuse to associate. The bare "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016). Courts have thus declined to find irreparable harm based solely on allegations that constitutional rights are violated. *E.g.*, *Castro v. City of Grand Prairie*, No. 3:21-cv-885, 2021 WL 1530303, at *2 (N.D. Tex. Apr. 19, 2021); *Sheffield v. Bush*, 604 F. Supp. 3d 586, 609 (S.D. Tex. 2022). And, as explained below, Plaintiffs have not shown a likelihood of success on their claims.

## II.  Plaintiffs fail to show likelihood of success on the merits.

### A.  *The CTA is authorized by Congress's enumerated powers.*

The CTA falls within Congress's authority for two independent reasons. First, the statute regulates commercial entities and is thus directly authorized by the commerce power. Second, corporate ownership reporting effectuates a number of powers vested in the federal government,

including the commerce, tax, and national-security powers, and is therefore authorized by the Necessary and Proper Clause. Either of these bases suffices to defeat Plaintiffs' challenge, so they have failed to "establish that no set of circumstances exist under which the Act would be valid." *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (characterizing a "facial challenge to a legislative Act" as "the most difficult challenge to mount successfully"); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 536-37 (2012). Because Plaintiffs have not "clearly demonstrated" that Congress lacked the constitutional authority to pass the CTA, *see NFIB*, 567 U.S. at 538, they cannot show a likelihood of success.

The Constitution vests Congress with the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. This authority encompasses "the power to enact 'all appropriate legislation' for its 'protection or advancement'; to adopt measures 'to promote its growth and insure its safety'; [and] 'to foster, protect, control and restrain.'" *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36-37 (1937) (internal citations omitted). Congress's power in this realm "can be expansive," and may reach "seemingly local matters" in certain circumstances. *NFIB*, 567 U.S. at 536-37. Indeed, in addition to regulating the "channels" and "instrumentalities" of interstate commerce, Congress may "regulate activities that substantially affect interstate commerce," even if such activities are "purely local." *Gonzales v. Raich*, 545 U.S. 1, 16-17, 34 (2005) (citations omitted).

When assessing Congress's power in this sphere, the court "need not determine whether [the regulated] activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id.* (citing *United States v. Lopez*, 514 U.S. 549, 557 (1995)). Supreme Court precedent recognizes multiple "historically rooted means of congressional regulation under the commerce power: (1) whether the activity is 'any sort of economic enterprise, however broadly one might define those terms'; or (2) whether the activity exists as 'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" *Groome Res. Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192, 205 (5th Cir. 2000) (quoting *Lopez*, 514 U.S. at 561).

The Necessary and Proper Clause authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its other enumerated powers and the powers vested in the Executive Branch.  U.S. Const. art. I, § 8, cl. 18.  The Clause "makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive,' to the authority's 'beneficial exercise.'" *United States v. Comstock*, 560 U.S. 126, 133-34 (2010) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413, 418 (1819)).  It is therefore sufficient if "the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."  *Id.* at 134.

**1.**  The CTA is authorized by the Commerce Clause because its reporting requirements form a critical part of the federal government's comprehensive anti-money laundering regime.  "[M]oney laundering is a quintessential economic activity."  *United States v. Goodwin*, 141 F.3d 394 (2d Cir. 1997).  The same is true of fraud, drug trafficking, and other financial crimes targeted by the CTA.  *See United States v. McClaren*, 13 F.4th 386, 402 (5th Cir. 2021) (drug trafficking is economic activity); *see also Groome Res. Ltd.*, 234 F.3d at 208 (discussing breadth of "economic activity").  "Indeed, it is difficult to imagine a more obviously commercial activity than engaging in financial transactions involving the profits of unlawful activity."  *Goodwin*, 141 F.3d at 399.  Plaintiffs do not dispute that Congress may, pursuant to the Commerce Clause, prohibit harmful economic activity.

Various economic crimes—including money laundering, terrorism financing, and tax fraud—are made easier to commit, and harder to discover, through the formation of various corporate entities which may conduct economic transactions in their own names without disclosing "information about the[ir] beneficial owners."  NDAA § 6402(2).  As Congress determined, "malign actors" can thus "conceal their ownership of corporations" and use them to conduct illicit transactions without detection.  *Id.* § 6402(3).  "This lack of transparency" has been "a primary obstacle to tackling financial crime in the modern era." H.R. Rep. 116-227, at 10; *see* 87 Fed. Reg. at 59,504-05.  Criminals exploit this knowledge gap.  *See, e.g.*, 87 Fed. Reg. at 59,503.

Congress passed the AMLA in response to these concerns. The AMLA, of which the CTA is a part, aims "to modernize" existing federal legislation seeking to combat "money laundering and counter[] the financing of terrorism," among other financial crimes. NDAA §§ 6001, 6002(2), 6401. The CTA fills an important gap in Congress's comprehensive regime to prevent money laundering by facilitating the uniform collection of beneficial ownership information. *Id*. § 6002(5). Congress determined that this information "is needed" to "protect interstate and foreign commerce" and "counter money laundering, the financing of terrorism, and other illicit activity." NDAA § 6402(5). Congress further determined that this information would "discourage the use of shell corporations as a tool to disguise and move illicit funds" and "assist national security, intelligence, and law enforcement agencies with the pursuit of crimes." *Id.* § 6002(5). Although Plaintiffs repeatedly dismiss (at 5, 11, 24) these findings as "boilerplate," they are part of the statute's enacted text and rest on an extensive record demonstrating that "efforts to investigate corporations and limited liability companies suspected of committing crimes have been impeded by the lack of available beneficial ownership information." H.R. Rep. 116-227, at 2.[1] Failing to collect this information would leave a "gaping hole" in Congress's efforts to curb illicit financial activity. *See Raich*, 545 U.S. at 22.

Other courts have accordingly recognized that the CTA falls readily within Congress's authority to enact. *See Cmty. Ass'ns Inst. v. Yellen* (*CAI*), No. 1:24-cv-1597, 2024 WL 4571412, at *7 (E.D. Va. Oct. 24, 2024), *appeal filed*, No. 24-2118 (4th Cir. Nov. 7, 2024); *Firestone v. Yellen*, No. 3:24-cv-1034, 2024 WL 4250192, at *7 (D. Or. Sept. 20, 2024). Rather than grapple

---

[1] Plaintiffs' related disparagement (at 24) of these findings as "Capitol Hill-style talking points," "speculative assertions," and "jargon unsupported by facts" is puzzling in light of the congressional record, portions of which have been recited in this brief. Regardless, Plaintiffs' dissatisfaction with the "jargon" or "style" of these findings is irrelevant. No matter the label, the Supreme Court has instructed that federal district courts "must defer to a congressional finding that that regulated activity affects interstate commerce, if there is any rational basis for such a finding." *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276 (1981). As explained above, there is ample basis for Congress's findings here. And Plaintiffs' subjective beliefs about what may be necessary for "orderly society" or combatting crime, *see* Mot. at 17, must give way to the elected Branches' considered judgment on the matter.

with those decisions, Plaintiffs focus on the one district court to have gone the other way. *See Nat'l Small Bus. United v. Yellen* (*NSBU*), 721 F. Supp. 3d 1260 (N.D. Ala. 2024), *appeal filed*, No. 24-10736 (11th Cir. Mar. 11, 2024).[2]  Defendants respectfully submit that this lone district court opinion (which the Eleventh Circuit is considering on appeal) should not persuade this Court to reach a similar conclusion.  The district court's decision rested on its conclusion that the CTA was an isolated, "single-subject statute" such that the "'comprehensive regulatory scheme' framework" analysis did not apply.  *See id.* at 1284.  The district court's analysis in *NSBU* overlooks the CTA's important role within "Congress's broader statutory regime targeting money laundering and terrorism financing," *CAI*, 2024 WL 4571412, at *7, as other federal courts that have considered the question have held.  *See id.*; *Firestone*, 2024 WL 4571412, at *7 (CTA part of "regulatory scheme").

Further, the *NSBU* court's conclusion (upon which Plaintiffs rely, *see* Mot. at 7, 17) that the "CTA is far from essential" because similar reporting is required under a 2016 rule neglects important aspects of the problem, as Congress found.  NDAA § 6402(5); *see also* 87 Fed. Reg. at 59,548 (explaining relationship between the CTA and the 2016 rule).  First, the 2016 rule applies only to entities that choose to become customers of a comparatively narrow set of financial institutions.  *See* 31 C.F.R. §§ 1010.230(f), 1010.605(e).  Second, the rule required those institutions to retain—but not transmit to the government for law-enforcement purposes—certain customer information.  Congress determined that the CTA was necessary to fill this gap and help combat crime, and there is no basis for second-guessing its judgment here.  *See Hodel*, 452 U.S. at 283 (noting "effectiveness of existing laws" generally "committed to legislative judgment").

**2.**  The CTA is also authorized by the Commerce Clause because it regulates economic activity with a substantial effect on interstate and foreign commerce.  After all, the CTA applies to corporations and other entities legally authorized to conduct commercial transactions, and it excludes from its reach many non-profits and domestically owned entities that are no longer

---

[2] The appeal was fully briefed as of June 2024, and the Eleventh Circuit held oral argument on September 27, 2024.  The matter is currently under submission and awaiting decision.

"engaged in active business" or "otherwise hold[ing] any kind or type of assets." 31 U.S.C. § 5336(a)(11)(xix), (xxiii).

Plaintiffs resist this straightforward conclusion, suggesting that incorporating entities has nothing to do with commerce. Mot. at 12-13 (citing *NFIB*, 567 U.S. at 557).[3] But it is hardly speculative that entities that incur the trouble and expense of filing papers to obtain authority to conduct commercial transactions in their own name go on to engage in commercial activity. For that reason, the CTA applies to a class of entities that can be used to conduct and conceal illicit transactions—namely, domestic corporations that are incorporated under state law or foreign entities that obtain permission from a state to engage in business in the United States, *see* 31 U.S.C. § 5336(a)(11). (And Plaintiffs do not deny that their entities engage in commerce.) The universe of entities subject to the CTA's reporting requirements confirms that the statute is a constitutional, commercial regulation. The reporting requirements thus govern entities with both the power and the purpose of conducting the types of economic transactions that concerned Congress.

Unable to refute this uncontroversial fact, Plaintiffs resort to arguing that the CTA "regulate[s] creating a corporate entity" and therefore violates "state sovereignty." Mot. at 12-13. But the CTA does not purport to override or preempt any state-law incorporation provisions, and "it makes little sense to see the Act as *regulating* corporate entity formation." *CAI*, 2024 WL 4571412, at *7; *see also NSBU*, 721 F. Supp. 3d at 1274 ("To be sure, the CTA is not a direct regulation of corporate formation."). Instead, the CTA refers to businesses "created by the filing of a document with a secretary of state" as a means of identifying entities with authority to perform economic transactions in their own name, 31 U.S.C. § 5336(a)(11), and that can accordingly be

---

[3] Plaintiffs' reliance on *NFIB* is misplaced. In *NFIB*, the Court explained that Congress has never invoked its commerce power "to compel individuals not engaged in commerce to purchase an unwanted product." 567 U.S. at 549. Here, Congress is not regulating any entity because of its inactivity. Congress is doing just the opposite, regulating a class of entities that have taken the affirmative step seeking authorization to conduct commercial transactions in their own name. Further, unlike the "novelty" of the regulation in *NFIB*, *see id.*, "[r]egulation requiring the submission of information" is a "familiar category" of federal legislation, *Elec. Bond & Share Co. v. SEC*, 303 U.S. 419, 437 (1938).

used to perpetrate "money laundering," "the financing of terrorism," and other crimes without disclosing the owners, NDAA § 6402(3). Entity formation is a necessary predicate to the application of the CTA's reporting requirements, but it is not itself an object of the CTA.

**3.** The CTA is also necessary and proper for carrying into execution other powers vested in the federal government, including the tax, foreign-affairs, and national security powers. As explained above, Congress reasonably determined that the CTA would facilitate tax collection, advance foreign-policy objectives, and protect national security.[4]

Plaintiffs' arguments to the contrary (at 13-15) fall flat. First, they assail the "vague reference" to international norms, contending that they "are not on the vanguard of foreign policy," and lack any "significant connection to national security." That misses the point. Congress expressly found that the CTA would protect "foreign commerce" and that collection of beneficial ownership information would both protect "national security interests" and bring the United States into compliance with international anti-money laundering norms. NDAA §§ 6402(3), 6402(5)(C). Plaintiffs' subjective beliefs cannot supplant the "plenary authority of Congress to regulate foreign commerce," *Shultz*, 416 U.S. at 59, nor Congress's "broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963). The same is true of matters pertaining to national security, which "is the prerogative of the Congress and President." *Ziglar v. Abbasi*, 582 U.S. 120 (2017). The "international consensus" Plaintiffs refer to (at 13) makes the point. Far from any "deference to foreign law" as they claim, it reflects the government's efforts to "spur similar efforts" worldwide, a hallmark of its power to manage foreign affairs. *See* 87 Fed. Reg. at 59,499.

Second, Plaintiffs argue that the CTA is "too far afield" of Congress's power to lay and collect taxes, faulting Congress for listing "serious tax fraud" as just one of its several targets in passing the law. But "a law does not stop being a valid tax measure just because it also serves

---

[4] Count I of Plaintiffs' Complaint also asserts a claim under the Tenth Amendment. Since Plaintiffs do not brief this claim separately in their motion, Defendants do not respond to it here. Defendants reserve the right to seek dismissal of this claim through a motion or responsive pleading under Rule 12.

some other goal." *United States v. Bolatete*, 977 F.3d 1022, 1032 (11th Cir. 2020). Indeed, Congress's "genuine" concern about tax compliance is evident from the record, including the Treasury study mentioned above, *see supra* at p. 3. Plaintiffs' allegation that CTA reporting is "mostly unrelated to tax obligations," Compl. ¶ 6, admits that there is at least *some* relationship to the taxing power. And their argument that "[s]hell corporations . . . do not typically owe any taxes" (Mot. at 15) ignores that they can be used to hide assets of beneficial owners who do.[5]

> **B.** **The CTA does not violate the First Amendment.**

Plaintiffs next assert that the CTA, on its face, violates the "freedoms of speech and association" guaranteed by the First Amendment. Mot. at 15-17. Plaintiffs' facial challenge here must meet a "rigorous standard" that requires them to show—considering the "full range" of the CTA's scope—that its "unconstitutional applications substantially outweigh its constitutional ones." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397-98 (2024). In other words, Plaintiffs must show that "a substantial number of [the CTA's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (citation omitted). Plaintiffs come nowhere near making this showing.

Start with the CTA's plainly legitimate scope. The CTA does not restrict the expression of any entity or person. Instead, it merely requires that certain businesses report their applicants and beneficial owners to FinCEN. The government routinely requires the reporting of similar information. For example, taxpayers must disclose detailed information on their tax returns, *see* 26 U.S.C. § 6012; political campaigns must report contributions and expenditures, *see* 52 U.S.C. § 30104; and corporations involved in federal litigation must generally disclose their owners, *see*, *e.g.*, Fed. R. Civ. P. 7.1(a). These and other disclosure requirements have long been understood as constitutional, and Plaintiffs identify no basis for treating the CTA differently.

---

[5] Plaintiffs also point to (at 15) the fact that "[t]he final rule does not adopt standards that apply to practitioners filing tax forms on a client's behalf." 87 Fed. Reg. at 59,514. They seem to suggest that the difference in these standards takes CTA reporting outside the scope of the taxing power, but there is no reason why that should be the case.

Next, turn to Plaintiffs' claim that the CTA's reporting requirements burden their First Amendment right to free association.[6] "[F]reedom of association is never mentioned in the United States Constitution;" instead, "it is implicit in the other rights listed in the First Amendment." *McDonald v. Longley*, 4 F.4th 229, 245 (5th Cir. 2021) (citations and quotation marks omitted). Because the right to associate follows implicitly from the First Amendment's textual guarantees of "speech, assembly, petition, and free exercise, the scope of protection for association corresponds to the constitutional solicitude afforded to the mode of First Amendment expression in which a particular group seeks collectively to engage." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 50 (1st Cir. 2005). Accordingly, the right "does not cover concerted action that lacks an expressive purpose." *Id.* For example, requiring membership in a professional organization engaged in non-germane political or expressive speech burdens the right to freely associate. *See McDonald*, 4 F.4th at 245.

Even if Plaintiffs establish that the CTA burdens associational rights to engage in expressive conduct, the Court should then examine whether the statute imposes modest or severe burdens. "[M]odest burdens" are permissible when justified by the government's regulatory interests; "severe burden[s] on associational rights are subject to strict scrutiny" and upheld only when narrowly tailored to serve a compelling state interest. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451-52 (2008).[7]

---

[6] Plaintiffs do not appear to raise a "compelled speech" argument under the First Amendment. Such a challenge would be fruitless anyhow. The compelled speech doctrine is not implicated where the government requires submission of information. *See, e.g.*, *MA LEG Partners 1 v. Dallas*, 442 F. Supp. 3d 958, 968 (N.D. Tex. 2020). Even if it were, the CTA's requirements that regulated entities report "factual and uncontroversial" information concerning their ownership easily satisfies the Fifth Circuit's "deferential standard of review" in this context that considers only whether the disclosures are reasonably related to a regulatory interest and neither unjustified nor unduly burdensome. *RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 882 (5th Cir. 2024).

[7] Plaintiff Ramsland also contends that his First Amendment rights are chilled because a criminal conviction under the CTA could impede his gun ownership rights under 18 U.S.C. § 922(g)(1). Mot. at 1-2; Decl. of Russell Ramsland ¶ 4, ECF No. 16-4. This logic would call into question the constitutionality of many of the various reporting statutes that carry sufficient criminal penalties—all of which are an accepted part of our federal criminal scheme. *E.g.*, 26 U.S.C. § 7201. That is reason enough to reject it.

In some cases, compelled disclosure of membership with advocacy groups can constitute a burden on the right to free association because of the concrete evidence of a substantial risk of reprisal for engaging in protected expressive conduct. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). In *NAACP*, the Supreme Court invalidated a state statute that compelled an advocacy group to disclose its members "because NAACP members faced a risk of reprisals if their affiliation with the organization became known" and because the government "had demonstrated no offsetting interest 'sufficient to justify'" the disclosure. *Bonta*, 594 U.S. at 606-607 (summarizing *NAACP*). The risk of reprisal was especially potent in *NAACP* because of the state sought to compel the disclosure of the group's "ordinary rank-and-file members," 357 U.S. at 464-65, and uncontroverted evidence showed that "on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," *id.* at 462. By contrast, disclosure of the group's employees or officials posed less concern given the government's legitimate interest "in protecting its citizens in their dealings with paid solicitors or agents of foreign corporations by requiring identifications." *Id.* at 464.

Here, Plaintiffs do not show what expressive conduct the CTA compels, prohibits, or otherwise burdens. Mot. at 15. Nor do Plaintiffs explain to what extent this unspoken conduct is burdened by the CTA—except to insist that strict scrutiny is appropriate (which assumes without explanation that the burdens are severe). *See id.* at 17. Plaintiffs' conclusory allegations that the CTA deters them from creating or participating in local entities, *id.* at 15, are insufficient. For one thing, no court has ever identified a First Amendment right to create corporate entities in the first place. For another, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *See Laird v. Tatum*, 408 U.S. 1, 13-14 (1972); *see also Citizens United v. FEC*, 558 U.S. 310, 370 (2010).

The cases Plaintiffs cite underscore that their First Amendment claim is meritless. Plaintiffs invoke *NAACP* but never point to concrete evidence they (or any beneficial owners) face any "risk of reprisal" as a result of the CTA's reporting requirements. *Bonta*, 594 U.S. at 606-07.

Aside from allegations of subjective chill, Plaintiffs have made no "showing that on past occasions revelation of the identity of" any beneficial owner has exposed them to "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *See NAACP*, 357 U.S. at 462. Beyond general skepticism toward federal law enforcement, Plaintiffs cannot explain why disclosure of ownership of their entities or affiliated medical practices (or even membership in AAPS) to FinCEN would risk the type of reprisal at issue in *NAACP*.[8]

The only evidence Plaintiffs can muster is one incident where one *donor* to certain political causes was chilled from further donating by unfavorable media attention—an incident that occurred well before the enactment of the CTA. Decl. of Steven Hotze ¶ 14, ECF No. 16-2. This example, in addition to predating the CTA, offers Plaintiffs no support because (1) the CTA does not require disclosure of donor identities (and Plaintiffs do not claim otherwise) and (2) disclosures are made to FinCEN (not the media) and are kept secure and confidential. *See* 31 U.S.C. § 5336(c)(2), (8). Nothing about this incident proves that any owner has been or will be chilled from participating in expressive conduct because of the disclosure of beneficial ownership information to FinCEN. The Court should not credit Plaintiffs' evidence-free assertions that confidentially reporting information to comply with the CTA would chill expressive conduct. *See Citizens United*, 558 U.S. at 370 (rejecting claim where party "identified no instance of harassment or retaliation"). At bottom, "Plaintiffs' speculative and conclusory assertions that reporting beneficial ownership or control information will 'deter . . . persons from exercising their rights of free speech and association . . .' are insufficient." *See Firestone*, 2024 WL 4250192, at *7.

Moreover, the CTA, unlike the law at issue in *NAACP*, does not require disclosure of anyone who is merely associated with regulated entities thorough "ordinary rank-and-file" membership. To the contrary, it only requires disclosure of "beneficial owners" who own or control regulated entities. 31 U.S.C. § 5336(a)(3)(A). And the CTA expressly exempts groups

---

[8] In fact, much of AAPS's leadership, membership, and advocacy activities (including the filing of this lawsuit) is publicly available through AAPS's press releases, newsletters, and journal editions, all of which can be found on AAPS's own website. *See* https://aapsonline.org.

that are likely to engage in expressive conduct: certain non-profits and political organizations.  31

U.S.C. § 5336(a)(11)(B)(xix)(II).[9]

Even if some of the CTA's applications burdened expressive conduct, Plaintiffs seemingly

acknowledge that the burdens are modest at most.  *See* Mot. at 7 (arguing CTA's requirements as

"largely redundant" of existing regulation).  Indeed, the Supreme Court has upheld "disclosure

requirements" over First Amendment challenge, reasoning disclosure is typically "a less restrictive

alternative to more comprehensive regulations of speech."  *Citizens United*, 558 U.S. at 369.  Thus,

the government's important regulatory interests in combatting money laundering and other illicit

financial transactions should justify any modest alleged burden.  *See Washington State Grange*,

552 U.S. at 452.  Moreover, because Plaintiffs fail to prove that any unconstitutional applications

of the CTA "substantially outweigh" its constitutional ones, *Moody*, 144 S. Ct. at 2397-98, they

cannot establish a likelihood of success here for their facial challenge.

### C.    The CTA does not violate the Fourth Amendment.

Plaintiffs' Fourth Amendment claim is likewise meritless.  The Supreme Court has long

recognized that reporting requirements of the kind at issue here raise no Fourth Amendment

concern.  In *Shultz*, the Court upheld a statute requiring banks to report transactions over a specified

dollar amount to the government. 416 U.S. at 67; *see* 31 U.S.C. § 5313.  For each covered

transaction, a bank must disclose the "name," "address," and "social security or taxpayer

identification number" of "the individual presenting [the] transaction."  *See e.g.*, 31 C.F.R.

§ 1010.312.  Congress explained that this information would be "highly useful" in "criminal, tax,

or regulatory investigations."  31 U.S.C. § 5311(1).  Because the relevant "information is

sufficiently described and limited in nature, and sufficiently related to a tenable congressional

determination as to improper use of transactions of that type," the Court concluded that the

reporting requirements were reasonable and therefore sustained them under the Fourth

_____

[9] The remaining authorities offered by Plaintiffs miss the mark.  They identify the right to marry, but do not explain how that could possibly be burdened by the CTA's reporting requirements.  They also cite to *United States v. Fortenberry*, 89 F.4th 702 (9th Cir. 2023), a case regarding proper venue in criminal trials with no discussion of any First Amendment rights.

Amendment. *Shultz*, 416 U.S. at 67. That conclusion reflects the well-established principle that where the government does not seek to make "non-consensual entries into areas not open to the public," the Fourth Amendment is more readily satisfied. *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984).

Consistent with these precedents, Congress has routinely enacted reporting requirements. As discussed above, federal law requires taxpayers to file tax returns and various entities to file tax information returns, 26 U.S.C. §§ 6012, 6031-60; employers to collect and make available information about new employees' eligibility to work, *see* 8 U.S.C. § 1324a; and political campaigns to report contributions and expenditures, *see* 52 U.S.C. § 30104. In sum, "reporting requirements are by no means per se violations of the Fourth Amendment," and "a contrary holding might well fly in the face of the settled . . . history of self-assessment of individual and corporate income taxes in the United States." *Shultz*, 416 U.S. at 59-60.

The CTA falls squarely within the category of reasonable reporting requirements that have long been understood to be constitutional. As with the statute in *Shultz*, the CTA directs the disclosure of information that Congress identified as "highly useful" to combatting serious crimes. *See* NDAA § 6402(8)(C); 31 U.S.C. § 5311(1). And Congress found that the CTA's corporate ownership reporting requirements were "needed" to combat "the financing of terrorism" and to "protect vital Unite[d] States national security interests." NDAA § 6402(5)(B), (D). "The CTA therefore serves government interests of the highest order." *Firestone*, 2024 WL 4250192, at *10.

Plaintiffs make no attempt to reconcile their position with *Shultz*, or with the many reporting requirements that have long been understood as constitutional. Instead, Plaintiffs assert (at 18-19) that the CTA's reporting requirements amount to a "warrantless search and seizure" and compile a host of authorities in an attempt to buttress that allegation. None provide any support. To the contrary, *United States v. Morton Salt Company* confirms the government's ability to obtain corporate information that is "reasonably relevant" to its regulatory aims. 338 U.S. 632, 652-53 (1950). *Morton Salt* thus accords with the Supreme Court's longstanding view that "reasonableness" is the touchstone of Fourth Amendment analysis. *See United States v. Brigham*,

19

382 F.3d 500 (5th Cir. 2004) (en banc).  Rather than addressing the reasonableness of the CTA's reporting requirements, Plaintiffs rely on entirely dissimilar cases.  *See Carpenter v. United States*, 585 U.S. 296 (2018) (concerning search of historical cell-site records to obtain detailed chronicle of individual's past movements); *Los Angeles v. Patel*, 576 U.S. 409 (2015) (concerning ordinance permitting police to enter hotels repeatedly and inspect their guest registers on demand); *Brown v. Texas*, 443 U.S. 47 (1979) (concerning physical arrest of a person who declined to identify himself to state police).  None of these cases cast any doubt on the constitutionality of a statute that requires certain businesses to self-report their beneficial owners.

Alternatively, even as to cases that establish a warrant requirement in some contexts, the CTA falls within the "special needs" exception to such a requirement.  *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 619 (1989).  The CTA addresses a need "beyond the normal need for law enforcement," *id.*—that is, the advancement of U.S. national security and foreign policy interests, *see Klayman v. Obama*, 805 F.3d 1148, 1149 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of rehearing en banc).  The compelling need to address threats to "U.S. national security and foreign policy interests," 87 Fed. Reg. at 59,500, outweighs any privacy interest in the limited disclosures required by the CTA.

### D.  The CTA does not violate the Fifth Amendment.

Plaintiffs' Fifth Amendment vagueness claim is equally meritless.  "[T]he degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment."  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982).  "[E]conomic regulation is subject to a less strict vagueness test" both because its scope "is often more narrow" and because businesses are "expected to consult relevant legislation in advance of action."  *Id.*  Moreover, "a scienter requirement may mitigate a law's vagueness."  *Id.*  The CTA is subject to substantially reduced vagueness scrutiny under these precedents: it is an economic regulation aimed at incorporation and its penalty provisions include scienter requirements, *see* 31 U.S.C. § 5336(h)(1) (willfulness); *id.* § 5336(h)(6)  (defining "willfully").

20

The CTA easily clears this bar. Plaintiffs contend (at 19) that various terms are "inadequately defined," challenging the CTA's definition of "beneficial owner," and specifically the extent to which it includes those who, through any "understanding, relationship, or otherwise," exercise "substantial control over the entity." 31 U.S.C. § 5336(a)(3)(A)(i). But the plain text of the "beneficial owner" definition allows ordinary people to understand what the law requires: reporting companies must report individuals who exert significant control over the company. *See id.*; *see also* 31 C.F.R. § 1010.380(d)(1) (additional guidance). While Plaintiffs contest each of the words that make up this definition as ambiguous, they offer no citation in support. And for good reason: Courts—including the Fifth Circuit—have repeatedly held that similar statutory terms pose no concern. *See United States v. Flores*, 63 F.3d 1342, 1373 (5th Cir. 1995) (rejecting argument that "the term 'substantial' is vague because it is subjective and has different meanings" and concluding that "'substantiality' requirement is frequently encountered and readily understood in a number of contexts"); *Wacko's Too, Inc. v. City of Jacksonville*, 522 F. Supp. 3d 1132, 1162-63 (M.D. Fla. 2021) (holding term "owner" not vague where statute indicated intent "to hold accountable those who control, direct, or otherwise exercise dominion"). Despite their protests, Plaintiffs seem to have a clear understanding of what these terms mean in this context. *See, e.g.*, Hotze Decl. ¶¶ 5, 16, 18 (affirming his own and family members' "substantial control" of various entities); Ramsland Decl. ¶ 2, ECF No. 16-4 (affirming "substantial control" over entity).

Even though Plaintiffs claim (at 21) that they "lack clear notice," they concede elsewhere that their entities are subject to the CTA. *E.g.*, Ramsland Decl. ¶ 4; Decl. of Daniel Rogers ¶ 8, ECF No. 16-5; Decl. of Jeremy Snavely ¶ 9, ECF No. 16-3. That concession is fatal. *See Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."); *Firestone*, 2024 WL 4520192, at *12. Plaintiffs cannot gainsay this clear application of the law by invoking a possible ambiguity regarding newly formed tax-exempt entities (which are not at issue here in any case). Mot. at 20. *United States v. Williams*, cited by Plaintiffs, confirms that a statute is not vague merely because "it may be difficult in some cases to determine whether [its] clear requirements have been met." 553 U.S. 285, 306 (2008).

21

"Close cases can be imagined under virtually any statute." *Id.* Nor can Plaintiffs prevail by offering hypotheticals how the "CTA could easily be used to prosecute critics of the federal government." Mot. at 20-21. "Speculation about possible vagueness in hypothetical situations not before the Court" cannot support a Fifth Amendment challenge. *Hill v. Colorado*, 530 U.S. 703, 733 (2000).[10]

### III.  The remaining factors weigh against injunctive relief.

The remaining two preliminary injunction factors—the balance of the equities and the public interest—"merge when the Government is the opposing party" and weigh sharply in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). As an initial matter, because Plaintiffs cannot establish the first two factors, the Court need not weigh the equities to deny relief. *See Mayo Found.*, 447 F. Supp. 3d at 535 (declining to consider final factors). The equities favor Defendants in any case. The speculative risk of harm Plaintiffs assert should be weighed against the obstruction of legitimate government functions that could result from the proposed injunction. *See Winter*, 555 U.S. at 24; *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (injunction frustrating "the Legislature's choice . . . imposes irreparable injury" on government). Plaintiffs' proposed injunction would interfere with Congress's judgment about how best "to counter money laundering, the financing of terrorism, and other illicit activity" as well as its ability to do so. NDAA § 6402(5). These compelling interests tip the scale against granting an injunction. *See CAI*, 2024 WL 4571412, at 10 (recognizing "the public interest (as noted by Congress) in the effective enforcement of federal law enforcement to counter money laundering and terrorism financing"); *Firestone*, 2024 WL 4520192, at *14 (similar).

---

[10] Because Plaintiffs' two-sentence argument on their APA claim simply restates their constitutional challenges, Mot. at 21, it fails for the reasons discussed above. Defendants reserve the right to argue that the APA challenge fails on other grounds, including that the rule constitutes agency action committed to agency discretion by law, 5 U.S.C. § 701(a), or involves a foreign affairs function of the United States, *id.* § 553(a)(1).

IV.      **Plaintiffs' proposed injunction is improper.**

Even if the Court disagrees with Defendants' arguments, any relief must be no broader than necessary to remedy any demonstrated irreparable harms of Plaintiffs here.  *See Gill v. Whitford*, 585 U.S. 48, 73 (2018).  Plaintiffs neglect to explain why a nationwide injunction is necessary to provide them with complete relief at this preliminary stage.  Even so, "[b]oth the Fifth Circuit and the Supreme Court have suggested that nationwide injunctions are, at best, reserved for extraordinary circumstances."  *Second Amend. Found. v. ATF*, No. 3:21-cv-0116, 2023 WL 4304760, at *3 (N.D. Tex. June 30, 2023); *see generally Labrador v. Poe*, 144 S. Ct. 921 (2024) (Gorsuch, J., concurring in the grant of a stay) (noting that preliminary injunctions ordinarily "may go no further than necessary to provide interim relief to the parties" and urging lower courts to fashion any injunctive relief within "equity's traditional bounds").

As several Justices have noted, universal injunctions are "legally and historically dubious," *Trump v. Hawaii*, 585 U.S. 667, 713-21 (2018) (Thomas, J., concurring), and provide plaintiffs a "boundless opportunity to shop for a friendly forum to secure a win nationwide."  *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring).  The latter concern is particularly acute here given the multiple similar challenges that are pending before federal courts nationwide, as well as the decisions by other district courts denying preliminary injunctions discussed above.[11]  "[T]o avoid rulings which may trench upon the authority of sister courts," *W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 729 (5th Cir. 1985), this Court should decline to issue the broad relief that Plaintiffs request.

---

[11] In addition to the *CAI* and *Firestone* cases, another district court has denied a motion for preliminary relief in a case challenging the constitutionality of the CTA.  *See* Order, *Small Bus. Ass'n of Mich. v. Yellen*, No. 1:24-cv-00314 (W.D. Mich. Apr. 26, 2024), ECF No. 24.  Numerous other cases presenting similar claims remain pending at this time.  *See, e.g., Black Econ. Council of Mass., Inc., et al. v. Yellen, et al.*, No. 1:24-cv-11411 (D. Mass.); *Boyle v. Yellen, et al.*, No. 2:24-cv-000081 (D. Me.); *Robert J. Gargasz, Co., LPA v. Yellen, et al.*, No. 1:23-cv-02468 (N.D. Ohio); *Smith et al. v. Yellen et al.*, No. 6:24-cv-00336 (E.D. Tex.); *Taylor, et al. v. Yellen, et al.*, No. 24-cv-00527 (D. Utah); *Texas Top Cop Shop, Inc., et al. v. Garland, et al.*, No. 4:24-cv-00478 (E.D. Tex.); *Trs. of the Lewis Wharf Condo. Tr. v. Yellen, et al.*, No. 1:24-cv-11679 (D. Mass.).

The alternative relief Plaintiffs propose is also improper. *See* Fed. R. Civ. P. 65(d) (requiring any injunction to "state its terms specifically" and "describe in reasonable detail" the conduct restrained). Plaintiffs seek to enjoin the CTA as to all "entities with which Plaintiffs and AAPS's members are or seek to be associated," Mot. at 25. This category is untenable. To begin, "associated" is not defined here and could encompass virtually anything that links an entity to Plaintiffs (or any one member of AAPS), and the government is unaware of "associated" entities regardless. And Plaintiffs' proposal that the CTA be enjoined as to each entity with which they (or any one member of AAPS) "seek to be associated," suggests that their desired injunction would operate on whim. This does not satisfy Rule 65(d).

Moreover, several of the findings Plaintiffs propose regarding the CTA are simply misstatements of the law. For example, Plaintiffs ask the Court to find that "FinCEN will assign a 'FinCEN identifier' to every person" who discloses information. Prop. Order at 2, ECF 16-6. That is wrong. FinCEN does not assign FinCEN identifiers to every person who submits information; rather, individuals and reporting companies "*may* obtain" an identifier upon request and may use that identifier "in lieu of" providing otherwise required information. *See* 31 C.F.R. § 1010.380(b)(4) (emphasis added); *see also* 31 U.S.C. § 5336(b)(3)(A)(i) (issuance of identifier "[u]pon request"); FinCEN FAQ M.3, https://perma.cc/LE24-SVRB.

## CONCLUSION

The Court should deny the motion for a preliminary injunction.

Respectfully submitted,

LEIGHA SIMONTON
UNITED STATES ATTORNEY

/s/ *Saurabh Sharad*
Saurabh Sharad
Assistant United States Attorney
New York Bar No. 5363825
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8600
Facsimile: 214-659-8807
saurabh.sharad@usdoj.gov

Attorneys for Defendants

**CERTIFICATE OF SERVICE**

On November 18, 2024, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.

/s/ *Saurabh Sharad*
Saurabh Sharad
Assistant United States Attorney

26